IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARY GRAHAM, as
Personal Representative of
Kenneth Graham, Deceased,

    Plaintiff,

v.                                                                    Civ. 13-673 MCA/GBW

DONA ANA COUNTY, et al.

    Defendants.

## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFF'S COMPLAINT AND MEMORANDUM IN SUPPORT THEREOF

    COMES NOW Plaintiff MARY GRAHAM, as Plaintiff and as Personal Representative of the Estate of Kenneth Graham, and files this Response to Defendants' Motion For Summary Judgment On Plaintiff's Complaint.

### INTRODUCTION

    1. Defendants correctly state that Plaintiff has alleged four claims against Defendants. Those claims are Count 1: Assault Upon and Seizure of Kenneth Graham without Probable Cause; Count 2: Assault Upon and Seizure of Kenneth Graham with Excessive Force; Count 3: Malicious Prosecution of Kenneth Graham without Probable Cause; and Count 4: Infliction of Emotional Distress of Mary Graham.

    2. Defendants are wrong in their conclusion that none of the counts are viable. *See Part II of this Response, pp. 3-6.*

### DEFENDANTS' STATEMENT OF FACTS

    3. For purposes of this Response Plaintiff admits Defendants' Fact No. 1 through No. 4, and Fact No. 6 through No. 9.

4. Plaintiff denies that part of Fact No. 5 that specifically states, "Then Mr. Graham stated that he was going to hit Deputy Rashe and he attempted to pick up a rock."

5. Plaintiff denies that part of Fact No. 5 that alleges "Fearing for his safety, Deputy Rashe attempted to tase Mr. Graham . . . ."

6. In response to Fact No. 5, Plaintiff states that Deputy Rashe was not in fear for his safety, and that Deputy Rashe did not attempt to tase Kenneth Graham but successfully tased him. *Affidavit of Robert Michael Matson, attached hereto as Plaintiff's exhibit 1.*

## STANDARD OF REVIEW

7. Plaintiff agrees with Defendants' legal analysis that summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). It is also an accurate statement of law that the court is required to view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment, if there is a genuine dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769 (2007).

## PART I: PLAINTIFF CONCEDES THAT ESTABLISHED FEDERAL LAW IS CONTRARY TO HER CLAIM FOR INTENTIONAL TORTS AGAINST KENNETH GRAHAM

8. Plaintiff's Complaint alleges three counts under 42 U.S.C. Section 1983 that are specific to Kenneth Graham; namely, Assault and Seizure without Probable Cause, Assault and Seizure with Excessive Force, and Malicious Prosecution. Defendants cited *Oliveros v. Mitchell*, 449 F.3d 1091 (10th Cir. 2006), which held that Section 1983 claims founded on intentional conduct do not survive the death of the injured party if the injured party's death is unrelated to the causes of action. Plaintiff concedes that established federal law (*Oliveros*) is contrary to her position and that *Oliveros* is the controlling authority. This court therefor has no alternative but to grant Defendants' Motion

For Summary Judgment as to the intentional torts alleged to be a violation of federal law. Those counts are specifically Counts 1, 2, and 3 (see paragraphs 45, 49, and 51 of Plaintiff's Complaint).

9. However, *Oliveros* did not address the issue of whether an injured party's state law tort claims survive the injured party when he dies of a cause unrelated to his injury. The question left unanswered is whether a party's claim founded upon a tort of negligence that may rise to a civil rights violation survives the injured party's death when his death is unrelated to the injury. In Count 1 of Plaintiff's Complaint, she alleged assault and seizure of Kenneth Graham without probable cause; in Count 2 of Plaintiff's Complaint, she alleged assault and seizure of Kenneth Graham using excessive force; and in Count 3 of Plaintiff's Complaint, she alleged malicious prosecution. In each count she specifically claimed that the conduct was in violation of the New Mexico Constitution and the New Mexico Tort Claims Act. It is Plaintiff's contention that each of these acts is founded upon negligent conduct. To understand why, a brief discussion differentiating an intentional tort from a negligent tort is in order.

10. An intentional tort is any deliberate interference with a legally recognized interest, such as the right to bodily integrity, freedom from confinement, and dominion over property. These interests are violated by the intentional torts of assault, battery, trespass, false imprisonment, invasion of property, and misrepresentation. The intent element of these torts is satisfied when the tortfeasor acts with the desire to bring about the harmful consequences and is substantially certain that the consequences will follow. Mere reckless behavior, sometimes called willful and wanton behavior, does not rise to the level of an intentional tort. Negligence is the term used by tort law to characterize behavior that creates an unreasonable risk of harm to a person. A person acts negligently when his behavior departs from the conduct ordinarily expected of a reasonably prudent person under the circumstances. Most injuries that result from tortious behavior are the product of negligent or reckless behavior, not intentional wrongdoing.

11. The *Oliveros* court did not certify this open question of law to the New Mexico Supreme Court for clarification, but declined to do so. However, the issue was discussed in *Rodgers v. Ferguson*, 89 N.M. 688, 556 P2d 844 (N.M. App. 1976). In deciding in favor of the plaintiff's right to proceed with a personal injury claim after the unrelated death of the injured person, the court discussed New Mexico common law and the New Mexico survival statutes. The court concluded that at common law an intentional tort did not survive the unrelated death of the injured person, but remarked that the rule was "entirely consonant with attitudes that were current in early English history." *Id.* Those attitudes were based upon a belief that suits of this sort were "a matter of personal vengeance and punishment . . . between the transgressor and his victim." Once the injured person died, his "death erased the purpose of a civil action between them." *Id.* This attitude changed over time when the function of damages awards was recognized as compensatory rather than punitive. The ancient rule "did not develop in connection with the type of tort in this case—negligence—because the tort of negligence did not evolve until approximately 1825." *Id.* *Rodgers* went on to say, . . .[T]he reason for the rule ceased to exist once damage awards were recognized as compensatory." *Id.*

12. Based upon a close reading of *Rodgers*, it is clear that in New Mexico, "The rule that claim for personal injury does not survive the death of the victim is not applicable to conditions in New Mexico because the tort of negligence did not exist when the rule developed and because there is no reason for such a rule in connection with compensatory damages." *Id*. It appears that had the *Oliveros* court certified the specific question to the New Mexico Supreme Court for decision, the decision would have supported a right to proceed on tort claims for personal injury founded upon negligent or grossly negligent conduct. For this reason this court should deny Defendants' Motion For Summary Judgment on Plaintiff's Counts 1, 2, and 3 founded upon negligent or grossly negligent conduct.

PART II: THERE IS A DISPUTE AS TO COUNT 4 OF THE COMPLAINT,
WHICH ALLEGES INFLICTION OF EMOTIONAL DISTRESS
AS TO PLAINTIFF MARY GRAHAM

13. In the Argument portion of Defendants' Motion For Summary Judgment, Part II, they wrongly identify Plaintiff Mary Graham's infliction of emotional distress claim as one tied to 42 U.S.C. Section 1983. They argue that, "Plaintiff alleges that Defendants violated Section 1983 by committing the state law torts of intentional infliction of emotional distress." *Motion, Part II, pages 6 and 7*. They then argue that a state law tort that forms the basis of a Section 1983 claim is not actionable under Section 1983. Defendants' argument is based upon a misreading of Plaintiff's Complaint.

14. For the claim of infliction of emotional distress Plaintiff alleged jurisdiction under New Mexico tort common law and the New Mexico Tort Claims Act. *Civil Complaint For Damages*, *page 1, ¶2*. Plaintiff did not allege that the claim of infliction of emotional distress was based upon 42 U.S.C., Section 1983. Plaintiff alleged a common law tort. *Civil Complaint For Damages*, page 11, ¶54-60. Plaintiff's claim for infliction of emotional distress is firmly rooted in the common law of New Mexico, and the New Mexico Tort Claim Act.

A. PLAINTIFF'S CLAIM OF EMOTIONAL DISTRESS

15. The New Mexico Tort Claims Act provides governmental entities and public employees acting in their official capacities with immunity from tort suits unless the Act sets out a specific waiver of that immunity. See 41-4-1 et. seq. NMSA 1978 and specifically Section 41-4-4 NMSA 1978.

16. Section 41-4-12 is the section of the Act that sets out the applicable waiver of immunity for tort claims against law enforcement officials. "In order to state a tort claim. . . . a plaintiff must demonstrate that the defendants were law enforcement officers, acting within the scope of their duties, and the plaintiff's injuries arose out of either a tort enumerated in this

section or a deprivation of a right secured by law" or a right secured by the constitutions. *Weinstein v. City of Santa Fe Ex Rel Santa Fe Police Dept.*, 1996-NMSC-021, 121 N.M. 646, 916 P.2d 1313.

17. In *Weinstein*, *supra*, police officers were negligent in their preparation of paper work necessary to hold an arrested felon; as a result, the felon was released from jail; the felon later attacked and raped Yael Weinstein as she was speaking to her parents on the telephone. Yael Weinstein brought suit against the officers for the battery that was committed upon her by the felon due to the officers' negligence in allowing him to be released. Her parents brought suit for the "negligent infliction of emotional distress" that they suffered as they listened to their daughter being raped while they were on the phone. The police moved to dismiss the civil complaint, arguing that they did not commit any of the enumerated torts against Yael and that her parents' claim did not come within the enumerated torts in the statute. The Supreme Court of New Mexico analyzed the facts of the case, the waiver of immunity statute and other applicable state law to determine whether the Weinsteins stated a claim under the law. The Supreme Court concluded that the Weinsteins stated claims under the tort claim act and remanded the case to the district court for further proceedings.

18. The *Weinstein* case, though not on all fours with the case at bar, is an instructive case in determining whether Plaintiff states a claim in the case at bar.

19. A full reading of the *Weinstein* case and a full understanding of the statutes and precedent cited therein, provide sufficient legal argument to rebut the contentions of the Defendants in their Motion for Summary Judgment. The only difference between the two cases is that in *Weinstein* the plaintiffs relied upon Section 3-13-2A(2) NMSA 1978 to establish a statutory right for which immunity had been waived; in the case at bar, Plaintiff relies upon

Section 3-13-2A(4)(a) NMSA 1978 to establish a statutory right for which immunity has been waived.

20. Section 3-13-2 NMSA 1978 is the general statute that describes municipal police officer obligations in New Mexico. The Supreme Court held that it creates a right that extends to individuals, the breach of which is actionable under Section 41-4-12 of the New Mexico Tort Claim Act. See *Weinstein, supra.*

21. In pertinent part to the case at bar the municipal police officer obligation statute states:

3-13-2 Police officers.

A    The police officer of a municipality shall:

(4)    within the municipality

(a)    suppress all .... disturbances and breaches of the peace.

22. These obligations of municipal officers inure to the benefit of private individuals, and the violation of the statutory duties give rise to a cognizable claim under the Tort Claims Act. See, *Weinstein, supra*. The fact that the Supreme Court was analyzing section A(2) of the statute in *Weinstein* and Plaintiff cites to Section A(4)(a) to analyze the claims of Plaintiff, makes no difference. A law enforcement officer "has the duty in any activity actually undertaken to exercise for the safety of others that care ordinarily exercised by a reasonably prudent and qualified office in light of the nature of what is being done". *Cross v. City of Clovis*, 107 N.M. 251, 755 P.2d 589 (1988).

23. Section 41-4-12 waives immunity for three types of claims: (1) the commission of an enumerated common-law tort; (2) the deprivation of a statutory right; and (3) the deprivation of a constitutional right. *Weinstein, supra*. The negligent infliction of emotional distress Plaintiff asserts is a claim of personal injury. The statutory duty that is owed to her springs from Section

7

3-13-2. The duty of due care was owed to her once she summoned the police for help, and the police began to act in furtherance of their statutory duty. Deputy Rashe had a duty to act with due care, or to exercise for the safety of others that care ordinarily exercised by a reasonably prudent and qualified officer in light of the nature of his response. Once Deputy Rashe acted negligently (or recklessly or unjustifiably), he breached his duty to Plaintiff. When he inflicted personal injury to Plaintiff by reason of inflicting negligent emotional distress, he breached his statutory duty, the breach of which duty is actionable under the provisions of Section 41-4-12 NMSA 1978. *See Plaintiff's exhibit 1*.

24. The *Weinstein* case holding and analysis is sufficient to overcome the Defendants' Motion for Summary Judgment is this case. However, the Plaintiff's claims also arguably come within the enumerated torts of Section 41-4-12.

## CONCLUSION

Plaintiff concedes that based upon current federal law this court should grant Defendants' Motion For Summary Judgment based upon Plaintiff's claim of violation of civil rights coming under the umbrella of 42 U.S.C. Section 1983. However, this court should deny Defendants' Motion For Summary Judgment based upon state tort law causes of action. This court should remand the state law claims of the case to the state district court from which Defendants had the case removed.

Respectfully submitted,

*/s/ Jose R. Coronado*
JOSE R. CORONADO
Attorney for Plaintiff
119 N. Main Street
Las Cruces, New Mexico 88001
(575) 525-2517

*/s/ G. Greg Valdez*
G. GREG VALDEZ
Attorney for Plaintiff
P.O. Box 6176
Las Cruces, New Mexico 88006
(575) 523-1505

## CERTIFICATE OF SERVICE

I certify that a copy of this Response To Defendants' Motion For Summary Judgment On Plaintiff's Complaint And Memorandum In Support Thereof was filed through the CM/ECF system which caused the following parties to be served electronically: Jonlyn M. Martinez, jonlyn@jmartinezlaw.net, Attorney for Defendants, P.O. Box 1805, Albuquerque, NM 87103-1805, this 10th day of June, 2014.

*/s/ electronically signed*
Jose R. Coronado

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARY GRAHAM, as
Personal Representative of
Kenneth Graham, Deceased,

    Plaintiff,
v.                                                                                  Civ. 13-673 MCA/GBW

DONA ANA COUNTY, et al.

    Defendants.

## AFFIDAVIT OF ROBERT MICHAEL MATSON

I, Michael Robert Matson, having been first duly sworn, upon oath do hereby depose and state as follows:

1. My name is Robert Michael Matson.

2. I am the stepson of Kenneth Graham.

3. I live at 818 West Calle Castile, Tucson, Arizona 85756.

4. I worked as a correctional officer at Arizona State Prison for about 5 or 6 years.

5. I am presently disabled.

6. I am 50 years of age and am married.

7. I was home on May 16, 2011, when my dad was having an episode and was acting out.

8. My dad had prostate cancer and was dying.

9. My dad was 83 years of age. He was deteriorating fast.

10. There were many times when my dad acted unreasonably and seemed incoherent.

11. On May 16, 2011 he was angry and verbally fought with my brother. As a result of his anger we called 911.

12. The purpose of calling 911 was to have someone come by—a medical person—and give him medication to calm him down.

1

PLAINTIFF'S EXHIBIT 1

13. Deputy Rashe of the Dona Ana County Sheriff's Office arrived by himself.

14. I greeted Deputy Rashe in the parking lot of our home. I told him my dad was terminally ill and was having an episode. I asked him why he appeared, because we had called for a paramedic.

15. As Deputy Rashe walked toward where I stood. I told him that earlier in the morning we were unable to wake my dad and we had to call a nurse.

16. Before we reached the home one of our neighbors told Deputy Rashe that my dad was a good neighbor. Deputy Rashe forcefully instructed her to leave, and at one point said to her, "get you're a__ back across the street."

17. I told Deputy Rashe that all he was going to accomplish was to scare my dad and upset him more.

18. I told Deputy Rashe that my dad was extremely sick and fragile.

19. I told Deputy Rashe that just before he arrived I caught my dad talking to his dead mother on the TV remote control.

20. Deputy Rashe was rude to me, and did not seem to listen to what I had to say.

21. Deputy Rashe turned on me and simply stated in an angry voice, "am I getting into a domestic?" When he said that, and the way he said it and abruptly turned away from me, led me to believe that there was no reasoning with Deputy Rashe, that he already made up his mind about how he was going to handle the situation.

22. I concluded that nothing I had said to him meant anything and I was concerned for how he was going to handle the situation.

23. Deputy Rashe never asked me who was in the home, where my mom was, what were the circumstances, or any other question.

24. I yelled at Deputy Rashe that there were significant extenuating circumstances involving a dying man, and I asked whether he had heard anything I said. He didn't respond.

25. As we got close to the home my 82 year old mother stepped out from the trailer area.

26. Deputy Rashe walked toward her. He instructed me to come no closer.

27. I could hear my dad speaking loudly, telling my mom to come back into the trailer.

28. Deputy Rashe came near a little fence near the trailer where my mom was.

29. My dad now saw deputy Rashe.

30. Deputy Rashe spoke to my mom for about five seconds, then he spinned away from her and toward my dad.

31. Deputy Rashe went through the little gate into the yard and toward my dad. As he did so, I saw him remove his taser from his holster.

32. I heard my dad tell Deputy Rashe he had no business being there. I heard him say, "get the f___ off my property before I beat you're a__ gawd damn it"

33. When I went to the fence I saw my dad on the steps leading to the trailer. He was pointing his finger and shaking it at Deputy Rashe.

34. I heard my dad tell Deputy Rashe that he better "get the f___k outta here before I beat you're a__s."

35. My dad used his left hand to prop himself up, using the screened porch wood frame.

36. Deputy Rashe stood to the side of my dad away from the step my dad was on.

37. Deputy Rashe had both hands on his taser, his legs were separated in a firing position, and he had the taser pointed at my dad.

38. My dad was yelling and I heard Deputy Rashe say, "I'm not going anywhere" at least three times.

39. My dad looked weak, frail, and pale.

40. I yelled at deputy Rashe, "You're not going to f____g taser my dad. Look how sick he is. You can tell he's gonna fall over any minute. Don't taser my dad, he's f____g dying."

41. I then heard the electrical buzz of the taser, followed by a brief scuffle, a thud, then my dad's groan.

42. I heard my mom scream out," Oh my lord, he's fallen face first into the ground."

43. I screamed at deputy Rashe, "You f____g tasered my dying dad. You f____g tasered a dying man, what the f___k is wrong with you."

44. Deputy Rashe yelled back at me that my dad was fine. Then he turned to my dad and said, "Kenneth, tell Robert you're fine." My dad did not respond.

45. I yelled at deputy Rashe, "Are you deaf? He's not fine. He's f____g dying you idiot, and you f____g tasered him. How can he be fine?"

46. My dad was face down on the ground, his feet toward the trailer and head towards me and the little front gate.

47. Deputy Rashe had his knee in my dad's back and said, "See? He's fine."

48. My dad heard the voice, and his head strained and bobbed upward to see who was talking. I saw he was bleeding.

49. All this time my mom was near the little gate and saw and heard what happened.

50. My mom was crying and hysterical.

51. Much later I was sitting near the middle of the driveway when deputy Rashe pulled next to me. He told me he would need my statement.

52. Deputy Rashe said we needed to get our story straight.

4

53. His phone then rang and he answered it. I heard him speak to his Lieutenant. After he finished his conversation he asked me if I was the one who called in a complaint for tasering my dad.

54. I told him I did not.

55. He then said somebody did, and then he said, "You saw the rock, right?"

56. I said, "What rock?"

57. He said, "The rock your dad had. He was going to throw it."

58. I responded and told him that, "There wasn't any rock. He (my dad) was on the porch, where the f___ would he get a rock.?"

Further affiant sayeth not.

                                            ROBERT MICHAEL MATSON

STATE OF Arizona     )
                           ) ss.
COUNTY OF Pima     )

SUBSCRIBED AND SWORN to before me this 9 day of June, 2014 by Robert Michael Matson.

                                            Notary Public

My Commission Expires:
June 30, 2017

DENISE IBARRA
NOTARY PUBLIC - ARIZONA
Pima County
My Commission Expires
June 30, 2017